**LEE LITIGATION GROUP, PLLC**
CK Lee (CL 4086)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDUARDO UZHCA, *on behalf of himself, FLSA Collective Plaintiffs and the Class,*<br><br>Plaintiff<br><br>v.<br><br>HIGHGATE HOTELS, L.P.,<br>ARTPROP PROPERTY LLC<br>d/b/a ARTHOUSE HOTEL,<br>and JOHN DOE CORPORATIONS 1-1000,<br><br>Defendants. | Case No.:<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff, EDUARDO UZHCA (herein, "Plaintiff"), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this Class and Collective Action Complaint against Defendants, HIGHGATE HOTELS, L.P. ("HIGHGATE"), ARTPROP PROPERTY LLC d/b/a ARTHOUSE HOTEL NEW YORK CITY ("ARTHOUSE HOTEL"), and JOHN DOE CORPORATIONS 1-1000, (collectively, the "Defendants").

## INTRODUCTION

1. Plaintiff brings this wage and hour class and collective action on behalf of himself and all persons who, during the applicable limitations period up to and including the present, were

similarly underpaid by Defendants in violation of protections afforded under the FLSA, and the laws and regulations passed in the following states:

(1) **Alaska**: Alaska Wage and Hour Act, Alaska Statute §23.10.050 *et seq.*;

(2) **Arizona**: Arizona Fair Wages and Healthy Families Act, A.R.S. § 23-340 *et seq.*, and the Arizona Minimum Wage Act Practice and Procedure A.A.C. R20-5-1201 *et seq.*;

(3) **California**: California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17210; and the California Labor Code and relevant Industrial Welfare Commission Wage Order;

(4) **Colorado**: Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101 *et seq.*, and the Colorado Minimum Wage Act, Colo. Rev. Stat. § 8-6-101 *et seq.*;

(5) **District of Columbia**: District of Columbia Minimum Wage Act Revision Act, D.C. Code § 32-1001 *et seq.*;

(6) **Florida**: Florida's Unpaid Wages Statute, Fla. Stat. 448.08 *et seq.*;

(7) **Georgia**: Georgia Minimum Wage Law, Official Code of Georgia Annotated O.C.G.A. § 34-4 *et seq.*;

(8) **Hawaii**: Hawaii Payment of Wages and other Compensation, Hawaii Revised Statutes Title 21 § *388-1 et seq.;*

(9) **Illinois**: Illinois Labor Laws, 820 ILCS 105 *et seq.*;

(10) **Massachusetts**: Massachusetts Minimum Fair Wage Law, Mass. Gen. L. ch. 151, §1A *et seq.*;

(11) **Nevada**: Nevada Minimum Wage Amendment of the Nevada Constitution, Nev. Const. art. 15, § 16, and the Nev. Rev. Stat. Chapt. 60,

(12) **New Hampshire**: New Hampshire Minimum Wage Law, N.H. Rev. Stat. § 279:1 *et seq.*;

(13) **New Jersey**: New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1 *et seq.*; and the New Jersey Wage and Hour Law, N.J.S.A. §§ 34:11-56a *et seq.*;

(14) **New York**: New York Labor Law ("NYLL"), Article 19 § 650 et seq., and Article 6 § 190 *et seq.*;

(15) **Pennsylvania**: Pennsylvania Minimum Wage Act 43 Pa. Cons. Stat. § 333.101 *et seq.*;

(16) **Puerto Rico**: Puerto Rico Working Hours and Days Laws, 29 L.P.R.A. §§271, *et seq.*;

(17) **Virginia**: Virginia Minimum Wage Act, VA Code § 40.1 *et seq.*;

(collectively, the "State Wage and Hour Laws").

2. Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et. seq.* ("FLSA"), that he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, including overtime, due to a policy of time-shaving, (2) disgorgement of illegally retained gratuities, (3) liquidated damages for unpaid wages and tips, and (4) attorneys' fees and costs.

3. Plaintiff further alleges that, pursuant to all State Wage and Hour Laws (as relevant to each individual), he and others similarly situated are entitled to recover from Defendants: (1) unpaid minimum wages, including overtime wages, (2) unpaid wages, including overtime, due to a policy of time-shaving, (3) unpaid spread of hours premiums (if applicable), (4) disgorgement of illegally retained gratuities, (5) statutory penalties, (6) liquidated damages, and (7) attorneys' fees and costs.

4. Plaintiff further alleges, on an individual basis, that pursuant to the NYLL, he is entitled to recover from Defendants: (1) reimbursement of unpaid business expenses, (2) liquidated damages for unpaid expenses, and (3) attorneys' fees and costs.

5. Plaintiff additionally alleges, on an individual basis, that Defendants unlawfully retaliated against him in violation of the NYLL and seeks to recover: (1) compensatory damages, (2) punitive damages, and (3) attorneys' fees and costs.

6. Plaintiff further alleges that, on an individual basis, pursuant to the New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL"), and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), that Plaintiff was deprived of his statutory rights and was discriminated against as a result of Defendants fostering a hostile work environment based on Plaintiff's race and nationality; and

seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

7. Lastly, Plaintiff alleges, on an individual basis, that Defendants committed common law breach of contract against him by taking actions to deny him access to accident insurance benefits that were included as part of his compensation and seeks to recover: (1) reimbursement of insurance deductions, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1337 and 1343 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391.

## PARTIES

10. Plaintiff, EDUARDO UZHCA, is a resident of Hudson County, New Jersey.

11. Defendant HIGHGATE HOTELS, L.P. is a foreign limited partnership organized under the laws of the State of Delaware and authorized to conduct business and operate in the State of New York.

12. Defendant ARTPROP PROPERTY LLC d/b/a ARTHOUSE HOTEL is a foreign limited liability company, organized under the laws of the State of Delaware and authorized to conduct business in New York, with a principal place of business located at 222 West 77th Street New York, NY 10024.

13. HIGHGATE is a third-party property investment and management company that manages and operates hundreds of hotels and resorts around the world, including more than a

dozen in New York City. HIGHGATE's aggregate real estate value is over fifteen billion ($15,000,000,000) dollars. HIGHGATE's portfolio includes the following seventy-four (74) properties around the United States. Additionally, HIGHGATE also operates an unknown number of properties throughout the United States (collectively, the "Properties").

| **Location Name** | **City** | **State** | **Property Type and Size** |
|---|---|---|---|
| Salmon Falls Resort | Ketchikan | AK | Resort with 52 Rooms |
| Hampton Inn Phoenix/Chandler | Chandler | AZ | Hotel with 101 Rooms |
| Holiday Inn Phoenix Chandler | Chandler | AZ | Hotel with 106 Rooms |
| Residence Inn Phoenix Chandler/Fashion Center | Chandler | AZ | Hotel with 102 Rooms |
| SpringHill Suites Phoenix Chandler/Fashion Center | Chandler | AZ | Hotel with 101 Suites |
| Crowne Plaza Phoenix Airport | Phoenix | AZ | Hotel with 290 Rooms |
| Four Points by Sheraton Phoenix South Mountain | Phoenix | AZ | Hotel with 160 Rooms |
| Hilton Phoenix Airport | Phoenix | AZ | Hotel with 259 Rooms |
| Holiday Inn & Suites Phoenix Airport North | Phoenix | AZ | Hotel with 228 Rooms |
| Hampton Inn & Suites Scottsdale/Riverwalk | Scottsdale | AZ | Hotel with 101 Suites |
| Hilton Tucson East | Tucson | AZ | Hotel with 232 Rooms |
| Pacific Edge Hotel on Laguna Beach | Laguna Beach | CA | Hotel with 125 Rooms |
| The Westin Long Beach | Long Beach | CA | Hotel with 469 Rooms |
| Hotel Diva | San Francisco | CA | Hotel with 116 Rooms |
| Hotel Union Square | San Francisco | CA | Hotel with 131 Rooms |
| Hyatt Regency San Francisco Downtown SOMA | San Francisco | CA | Hotel with 681 Rooms |
| Stanford Court | San Francisco | CA | Hotel with 393 Rooms |
| Hyatt Place Boulder/ Pearl Street | Boulder | CO | Hotel with 150 Rooms |
| The Beacon Hotel and Corporate Quarters | Washington | DC | Hotel with 199 Rooms |
| 24 North Hotel Key West | Key West | FL | Hotel with 145 Rooms |
| Fairfield Inn & Suites by Marriott Key West at The Keys Collection | Key West | FL | Hotel with 133 Rooms |
| Hilton Garden Inn Key West / The Keys Collection | Key West | FL | Hotel with 141 Rooms |
| Southernmost Beach Resort Key West | Key West | FL | Resort with 261 Rooms |
| The Gates Hotel Key West | Key West | FL | Hotel with 100 Rooms |
| The Marker Resort Key West | Key West | FL | Resort with 96 Rooms |

| | | | |
|---|---|---|---|
| The Elser Hotel | Miami | FL | Hotel with 646 Rooms |
| The Celino Hotel | Miami Beach | FL | Hotel with 132 Rooms |
| The Gates Hotel South Beach – A DoubleTree by Hilton | Miami Beach | FL | Hotel with 235 Rooms |
| Sawgrass Grand | Sunrise | FL | Hotel with 291 Rooms |
| Amrit Ocean Resort & Residences | West Palm Beach | FL | Resort with 100 Rooms |
| Residence Inn Atlanta Duluth/Gwinnett Place | Duluth | GA | Hotel with 128 Rooms |
| Mansion on Forsyth Park | Savannah | GA | Hotel with 125 Rooms |
| Alohilani Resort | Honolulu | HI | Resort with 839 Rooms |
| Ambassador Hotel Waikiki | Honolulu | HI | Hotel with 311 Rooms |
| Aston Waikiki Beach Hotel | Honolulu | HI | Hotel with 645 Rooms |
| Courtyard Waikiki Beach | Honolulu | HI | Hotel with 403 Rooms |
| Hilton Garden Inn Waikiki Beach | Honolulu | HI | Hotel with 600 Rooms |
| Pearl Hotel Waikiki | Honolulu | HI | Hotel with 132 Rooms |
| Inn of Chicago | Chicago | IL | Hotel with 359 Rooms |
| Taj Boston | Boston | MA | Hotel with 273 Rooms |
| Holiday Inn Boston-Brookline | Brookline | MA | Hotel with 226 Rooms |
| Courtyard Boston Cambridge | Cambridge | MA | Hotel with 216 Rooms |
| SpringHill Suites by Marriott Manchester-Boston Regional Airport | Manchester | NH | Hotel with 100 Suites |
| Holiday Inn Secaucus Meadowlands | Secaucus | NJ | Hotel with 161 Rooms |
| Renaissance Las Vegas Hotel | Las Vegas | NV | Hotel with 548 Rooms |
| Courtyard New York Manhattan/Upper East Side | New York | NY | Hotel with 226 Rooms |
| Crowne Plaza Times Square Manhattan | New York | NY | Hotel with 795 Rooms |
| DoubleTree by Hilton Hotel Metropolitan – New York City | New York | NY | Hotel with 764 Rooms |
| DoubleTree Suites by Hilton Hotel New York City – Times Square | New York | NY | Hotel with 468 Rooms |
| Hampton Inn Manhattan-Times Square North | New York | NY | Hotel with 300 Rooms |
| Hilton Garden Inn New York/Times Square Central | New York | NY | Hotel with 282 Rooms |
| Hilton Garden Inn Times Square | New York | NY | Hotel with 369 Rooms |
| Hotel 57 New York | New York | NY | Hotel with 204 Rooms |
| Hotel Mela | New York | NY | Hotel with 232 Rooms |
| Millennium Broadway Hotel New York | New York | NY | Hotel with 626 Rooms |
| NYLO New York City | New York | NY | Hotel with 285 Rooms |
| Paramount Hotel New York | New York | NY | Hotel with 605 Rooms |
| Park Central Hotel New York | New York | NY | Hotel with 761 Rooms |

| | | | |
|---|---|---|---|
| Park Lane Hotel | New York | NY | Hotel with 628 Rooms |
| Row NYC | New York | NY | Hotel with 1331 Rooms |
| Royalton New York | New York | NY | Hotel with 168 Rooms |
| Stewart Hotel | New York | NY | Hotel with 618 Rooms |
| The Knickerbocker | New York | NY | Hotel with 330 Rooms |
| The Manhattan at Times Square | New York | NY | Hotel with 685 Rooms |
| The Michelangelo Hotel | New York | NY | Hotel with 178 Rooms |
| The Wagner at the Battery | New York | NY | Hotel with 298 Rooms |
| Westhouse New York | New York | NY | Hotel with 172 Rooms |
| Renaissance Westchester Hotel | West Harrison | NY | Hotel with 348 Rooms |
| Homewood Suites Erie | Erie | PA | Hotel with 84 Suites |
| Split Rock Resort & Golf Club | Lake Harmony | PA | Resort with 384 Rooms |
| The Bellevue Hotel | Philadelphia | PA | Hotel with 184 Rooms |
| Mountain Laurel Resort | White Haven | PA | Resort with 175 Rooms |
| AC Hotel San Juan Condado | San Juan | PR | Hotel with 233 Rooms |
| The Westin Arlington Gateway | Arlington | VA | Hotel with 338 Rooms |

*See* https://www.highgate.com/portfolio/
*See also* https://www.hospitalityonline.com/highgate-hotels/locations

14. HIGHGATE controls and manages the Arthouse Hotel, where Plaintiff worked, through Defendant ARTPROP PROPERTY LLC (*see* **Exhibit A, p. 16**). HIGHGATE controls and manages the remaining Properties through JOHN DOE CORPORATIONS 1-1000.

15. HIGHGATE manages and operates all the Properties collectively as a single integrated enterprise, within meaning of the FLSA and all State Wage and Hour Laws. Specifically, the Properties are all operated and managed by HIGHGATE, engaged in related activities, and share a common business purpose:

a. HIGHGATE directly and actually hires and manages personnel of all the Properties. Employees can apply to any of the Properties through HIGHGATE's website. *See* **Exhibit B**. HIGHGATE advertises over 900 job postings for the Properties on their website. *See* **Exhibit C**.

b. HIGHGATE directly and actually manages the payroll for employees of all the

Properties, and all employees of all Properties are paid directly by HIGHGATE. *See* **Exhibit D**, copy of Plaintiff's paystub for a payment HIGHGATE made to Plaintiff for work performed at the Arthouse Hotel**.** Additionally, HIGHGATE directly and actually manages all relations and human resources for all employees of all the Properties.

c. Employees are directly exchanged between the Properties by HIGHGATE, and employees can also apply to initiate a transfer between HIGHGATE's Properties. Even though HIGHGATE manages numerous different brands of hotels and resorts (such as Hilton, Marriott, Hyatt, Holiday Inn, Sheraton, etc.), HIGHGATE's single integration allows for their employees to easily transfer between any of the different brands. On HIGHGATE's career page, HIGHGATE advertises that HIGHGATE employees "can switch brands without switching your employer."[1]

d. HIGHGATE's business purpose is to generate revenue from all the Properties by utilizing their "proficiencies across the hospitality management and investing landscape."[2]

16. At all relevant times, Defendants had gross annual revenues in excess of $500,000. Defendants HIGHGATE and ARTHOUSE HOTEL generated over $30,000,000 in yearly revenue in 2023, over $27,000,000 in 2022, and over $16,000,000 in 2021 (*see* **Exhibit A, p. 14**).

17. At all relevant times, Defendants were and continue to be an "enterprise engaged in commerce" within the meaning of the FLSA, all State Wage and Hour Laws and the Regulations thereunder.

---

[1] *See* https://www.highgate.com/careers/
[2] *See* https://www.highgate.com/what-we-do/

18. At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Defendants.

## NATIONWIDE FLSA COLLECTIVE ACTION ALLEGATIONS

19. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt food service employees (including room service staff, food and beverages staff, banquet staff, servers, waiters, food runners, and bartenders, among others) employed by Defendants at any of their Hotel Locations on or after the date that is three years before the filing of the Complaint in this case as defined herein (herein, "FLSA Collective Plaintiffs").

20. At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay Plaintiff and FLSA Collective Plaintiffs their (i) wages, including their overtime premium at one and a half times the regular rate for all hours worked over forty (40) in a workweek, due to a policy of time-shaving; (ii) illegal retention of gratuities; (iii) liquidated damages; and (iv) attorneys' fees and costs. The claims of Plaintiff stated herein are essentially the same as those of the other FLSA Collective Plaintiffs.

21. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from the Defendants. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## NATIONWIDE RULE 23 CLASS ALLEGATIONS

22. Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt food service employees (including room service staff, food and beverages staff, banquet staff, servers, waiters, food runners, and bartenders, among others) employed by Defendants at any of the Properties on or after the date that is six years before the filing of the Complaint in this case as defined herein (the "Class Period").

23. To the extent necessary, Plaintiff will designate subclasses for each of the States where Defendants have employees.

24. All said persons, including Plaintiff, are referred to herein as the "Class" or "Class Members." The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

25. The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number rests are presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class.

26. Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions. All the Class Members were subject to the same corporate practices

of Defendants of (i) failure to pay minimum wages, including overtime wages, (ii) failure to pay wages for all hours worked, including overtime, due to a policy of time-shaving; (iii) failure to pay spread of hours premium; (iv) illegal retention of tips; (v) failing to provide proper wage statements to employees; and (vi) failing to provide proper wage notices to employees.

27. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices, and procedures.

28. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented Plaintiffs in wage and hour cases.

29. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because of losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result

in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

30. Defendants violate all State Wage and Hour Laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. A class action provides Class Members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

31. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a. Whether Defendants employed Plaintiff and the Class within the meaning of all State Wage and Hour Laws;

b. What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not properly pay Plaintiff and the Class Members;

c. At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiff and the Class Members for their work;

d. Whether Defendants properly notified Plaintiff and the Class Members of their hourly rates and overtime rates;

e. Whether Defendants paid Plaintiff and Class Members the proper minimum wages under all State Wage and Hour Laws;

f. Whether Defendants paid Plaintiff and Class Members the proper compensation for all hours worked under all State Wage and Hour Laws;

g. Whether Defendants operated their business with a policy of not compensating employees for all hours worked due to time-shaving;

h. Whether Defendants accurately tracked the amounts of tips earned each day and maintained records thereof;

i. Whether Defendants illegally retained gratuities;

j. Whether Defendants paid Plaintiff and Class Members in the New York State spread of hours premium when their workdays exceeded ten (10) hours;

k. Whether Defendants provided proper wage statements informing all non-exempt employees of information required to be provided on wage statements as required under all State Wage and Hour Laws and applicable state laws;

l. Whether Defendants provided proper wage and hour notice, at date of hiring and with each change in pay rate thereafter, to all non-exempt employees, in their native language, per requirements of all State Wage and Hour Laws.

**STATEMENT OF FACTS**

*Plaintiff's Background*

32. In or around June 2021, Plaintiff EDUARDO UZHCA was hired by Defendants to work as a Bartender at Defendants' hotel – the "Arthouse Hotel" (the "Hotel"), located at 222 W

77th Street, New York, NY 10024. Plaintiff's employment with Defendants was terminated on April 15, 2025.

33. While Plaintiff was employed by Defendants, he was scheduled to work five days a week, Monday through Friday, from 4:30 p.m. until the bar closed, usually at 1:00 a.m. though at times as late as 2:30 a.m., depending on customer volume. In addition, approximately twice per month, Plaintiff would be asked work a sixth day on the same schedule. In total, Plaintiff worked between forty-two and a half (42.5) and fifty (50) hours per week in total.

34. Plaintiff was paid around fourteen dollars ($14.00) per hour at the start of his employment and received an approximately three percent (3%) raise each year.

*Minimum Wage Claims*

35. At all times, Plaintiff was paid below the minimum wage proscribed by the New York Labor Law. In 2024, the minimum wage in New York City was sixteen dollars ($16.00) per hour, and in 2025 it increased to sixteen dollars and fifty cents ($16.50) per hour. 12 N.Y.C.R.R. § 146-1.2. Plaintiff's starting salary with Defendants was already a dollar below the mandated minimum wage, and the small increases to that number that Plaintiff received from his raises were not sufficient to ever bring him above the minimum wage, with Plaintiff receiving a salary of $15.72 in 2024, and $16.19 in 2025. *See* **Exhibit D**, Plaintiff's Paystubs. Furthermore, although Plaintiff received tips, he was never told that he would be paid at a tip-credit rate, never received a tip notice, and was never informed that he would be paid less than the minimum wage for any reason at all.

36. Additionally, even if Defendants were to argue that Plaintiff was paid at a tip credit rate, this would be misplaced. Defendants were not entitled to claim any tip credits allowance from Plaintiff's, FLSA Collective Plaintiffs', and Class Members' wages under the FLSA and the NYLL

because Defendants: (i) failed to properly provide them with tip credit notice at their dates of hiring and annually thereafter; (ii) failed to provide Plaintiff with properly itemized wage statements (*see* **Exhibit D**), (iii) deducted tip credits for all hours worked despite having caused them to engage in non-tipped duties for hours exceeding twenty percent of the total hours worked each workweek; (iv) deducted tip credits for all hours worked despite requiring them to engage in non-tipped side-work for continuous periods of time exceeding thirty (30) minutes; (v) illegally retained tips from them, and (v) failed to accurately keep track of daily tips earned and maintain records thereof.

37. Defendants required Plaintiff to engage more than twenty percent of his working time performing non-tipped related activities, such as (i) dishwashing, (ii) moving furniture, (iii) assembling furniture, (iv) cleaning, (v) breaking down and reassembling the bar every day, which took up to two (2) hours per workday, consisting of more than twenty percent of the total hours worked each shift. Similarly, Defendants required FLSA Collective Plaintiffs and Class Members to engage in similar non-tipped duties for similar amounts of time.

38. While Plaintiff was paid overtime premiums of one and a half times his regular rate for hours he worked over forty in a week, because of Defendants improper base rate, Plaintiff was not paid the correct amount for his overtime hours. *Id.* Class Members were also paid at a similarly impermissibly low rate that was below the New York minimum wage.

39. Defendants knowingly and willfully operated their business with a policy of not paying Plaintiff and Class Members their proper minimum wages, in direct violation of the NYLL.

*Timeshaving Claims*

40. Plaintiff was regularly scheduled to work until closing time for the bar. Depending on the night, that time could vary from 1:00 a.m. until 2:30 a.m. After a couple of months of working for Defendants, Plaintiff noticed that his hours seemed lower than they should have been,

given the amount of time that he worked for. Upon reviewing Defendants' timekeeping system, Plaintiff observed that he had been clocked out at 1:00 a.m. rather than his actual departure time, which was frequently as late as 2:30 a.m. Once he had figured the situation, Plaintiff began to notice that he was frequently being clocked out before he stopped working. He complained to Defendants' manager numerous times about this problem but was usually ignored or rebuffed. FLSA Collective Plaintiffs and Class Members similarly had their time reduced.

41. Occasionally, Defendants would alter his hours to properly reflect how many hours he had actually worked, but it was a rare occurrence, usually following long arguments that Plaintiff was forced to have with Defendants' management. Even when Defendants acknowledged that Plaintiff's reported hours were incorrect, they would add it to his next paycheck as retroactive pay. However, when they did so, they added it in as regular hours, rather than as overtime hours. However, those hours should have been overtime hours as Plaintiff regularly worked over forty hours every week.

42. Additionally, Defendants had a policy of automatically deducting half an hour from employees' time each day for a lunch break. Approximately thrice per week, Plaintiff was unable to take his lunch break due to high traffic at the bar or certain time sensitive tasks. Although Plaintiff informed his managers when he worked through his lunch break, Defendants still automatically deducted half an hour from his compensable time. FLSA Collective Plaintiffs and Class Members were also automatically deducted time for lunch breaks, even when they worked through their lunch breaks.

43. Defendants knowingly and willfully operated their business with a policy of not paying Plaintiff, FLSA Collective Plaintiffs, and Class Members for all hours that they worked, in violation of the FLSA and all State Wage and Hour Laws.

*Unpaid Spread of Hours Claims*

44. Plaintiff frequently worked days that were longer than ten hours. Although Plaintiff's schedule usually had him working eight and a half (8.5) hours per day, he frequently left much later than his scheduled end time, resulting in a day with a spread larger than ten hours. When Plaintiff worked such days, Defendants never compensated him the proper spread of hours premium of one additional hour's pay at the minimum wage. Defendants similarly failed to compensate Class Members the proper spread of hours premium for workdays with a spread of hours larger than ten.

45. Defendants knowingly and willfully operated their business with a policy of not paying Plaintiff and Class Members their owed spread-of-hours premiums, in violation of the NYLL.

*Tip Retention Claims*

46. As part of his position as a bartender, Plaintiff participated in a tip pool. Defendants used the tip pool to illegally retain a portion of Plaintiff's tips. Defendants illegally included managers in the tip pool, such as the one who oversaw Plaintiff's bar. While his manager did serve the occasional customer when things were busy, it was not part of her regular duties. That manager was still given a full share in the tip pool.

47. For a long time, Plaintiff was unaware of the inclusion of Defendants' managers in the tip pool. Despite frequent requests from Plaintiff and other employees to see the tip sheets, Defendants regularly refused to show employees the tip sheets. Finally, when a new manager arrived, that manager acquiesced to Plaintiff's first request to see the tips sheets. When he was given permission to view the sheets, Plaintiff immediately noticed the presence of managers in the

tip pool. When Plaintiff brought this up to management, they brushed him off and he was once again prevented from viewing the tip sheets.

48. FLSA Collective Plaintiffs and Class Members were also forced to participate in tip pools which included managerial staff.

49. Furthermore, Defendants' tip pool allocation depended upon the number of hours that an employee worked. Each employee was assigned a certain number of points per hour, depending on their position. At the end of the night, their total points would determine their share of the tip pool. Due to Defendants' aforementioned timeshaving, Plaintiff, FLSA Collective Plaintiffs, and Class Members lost portions of their share in the tip pool each night, some of which was distributed to the improperly included managers.

50. Defendants knowingly and willfully operated their business with a policy of illegally retaining tips from Plaintiff, FLSA Collective Plaintiffs, and Class Members.

*WTPA Claims*

51. Defendants knowingly and willfully operated their business with a policy of not providing proper wage statements as required under the NYLL. Defendants failed to provide Plaintiff and Class Members with proper pay stubs reflecting the actual number of hours worked they worked. Additionally, Defendants also failed to provide Plaintiff and Tipped Subclass with proper pay stubs reflecting the tip credit claimed for each pay period.

52. At all relevant times, Plaintiff and Class Members never received a wage notice from Defendants.

53. In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not

providing wage notices to Plaintiff and Class Members at the beginning of their employment with Defendants.

54. Defendants further violated the WTPA by failing to provide Plaintiff and Class Members with any wage statements.

55. In failing to provide any wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs.*, 2020 U.S. Dist. LEXIS 49740, at *21-22 (S.D.N.Y. March 20, 2020)

56. Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doings, and necessitated the current litigation to vindicate Plaintiff's and Class Members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled

to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

57. Had Defendants provided any wage statements to Plaintiff and Class Members which accurately listed the total number of hours Plaintiff and Class Members actually worked and their proper pay rates, as required by law, Defendants would have had to either (a) increase employees' wages to correspond to the hours they actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the hours the employees actually worked. Either possibility would have allowed Plaintiff and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

58. The failure to provide any wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

59. The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, at *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-2 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d

846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[3]

60. The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

61. "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a

[3] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y., LLC*, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

62. Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with any wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours been accurately reported for a given pay period, Defendants would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants were supposed to submit to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

63. Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

64. The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case

that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*. Plaintiff and Class Members lost benefits by virtue of how Defendants failed to report their income, and how Defendants failed to report employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

65. Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

66. The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income. *Id.*

*Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993)

67. Here, the problem is not merely challenging but insurmountable. Plaintiff and Class Members cannot even attempt to have their earnings report corrected because Defendants failed to report their actual wages to the IRS. Because "[u]nder the Social Security statute, entitlement

depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiff was irreversibly injured with respect to his social security benefits as Defendants failed to send her W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

68. Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiff and Class Members with wage notices and accurate wage statements, in violation of the NYLL.

*Plaintiff's Individual Discrimination Claims*

69. Plaintiff is a Hispanic man. When he began working at Defendants' hotel, the Food and Beverage Manager was also Hispanic. However, shortly after Defendant Julian [LNU] ("Manager Julian" or "Julian") was hired as a supervisor in or around November 2024, he terminated the Hispanic Food and Beverage Manager and announced that he would take over that role himself.

70. It quickly became apparent that Julian was not capable of handling both his management responsibilities and those of the Food and Beverage Manager. As a result, Julian shifted substantial portions of the Food and Beverage Manager duties to Plaintiff, who was then working as a bartender. Plaintiff assumed responsibility for tracking inventory for both the bar and the kitchen, monitoring ordering trends and historical consumption data, and making monthly purchasing recommendations. These were core managerial functions that went far beyond Plaintiff's job description.

71. Despite delegating these high-level responsibilities to Plaintiff, Julian regularly berated him for his suggestions—often dismissing them outright, only to later blame Plaintiff when Julian's own ordering decisions resulted in shortages or disruptions in service.

72. Given Plaintiff's demonstrated capability in performing the core functions of the Food and Beverage Manager role, Plaintiff approached Julian to request a formal promotion to that position. Plaintiff explained that the dual responsibilities were interfering with his ability to fulfill his primary role as a bartender, and that a promotion would allow both him and Julian to better perform their respective duties. It would also have resolved ongoing friction between them. Julian denied the request and stated: "We just don't need a Food and Beverage Manager right now."

73. Just two weeks later, Defendants hired a white male with less experience than Plaintiff into the Food and Beverage Manager role. When Plaintiff questioned Julian about this apparent contradiction, Julian simply stated: "Now we need one." The pretextual nature of Julian's earlier denial became immediately clear to Plaintiff.

74. The pattern of unequal treatment continued. Around the same time, Defendants hired a new bartender who, like the newly hired manager, was white and had less experience than Plaintiff. Plaintiff later learned that this new bartender was earning a higher hourly wage than Plaintiff and received more points per hour in the tip pool—despite performing the same job with less experience.

75. Plaintiff reasonably believed that he was being denied promotional opportunities and paid less than his white coworkers because of his race and national origin. When Plaintiff raised this concern with his managers, they dismissed his complaint and refused to adjust his compensation. He subsequently elevated his concerns to Human Resources.

76. HR advised Plaintiff not to pursue a formal complaint with the Department of Labor and instead recommended that he attend a meeting with the Hotel's General Manager to resolve the issues internally. Plaintiff attended the meeting, which included HR, the General Manager, and

Julian. Although Defendants denied that race played a role in any employment decision, they took no corrective action and failed to adjust Plaintiff's compensation to match that of his less-experienced white counterpart.

77. Defendants' failure to promote Plaintiff, their decision to hire and pay less-experienced white employees more than Plaintiff, and their refusal to take remedial action after Plaintiff raised concerns all support a strong inference of unlawful discrimination based on race and national origin in violation of the NYSHRL and NYCHRL.

78. Defendants grossly and intentionally violated Plaintiff's rights to a workplace free of discrimination under the NYSHRL and the NYCHRL. Plaintiff is entitled to compensatory damages as a result of Defendants' egregious and unlawful practices.

*Plaintiff's Individual Retaliation and Interference Claims*

79. Over the course of his employment, due to Defendants' many violations of Plaintiff's rights, Plaintiff lodged numerous complaints about those violations. Plaintiff complained to various different managers and the human resources department about: his wages; his improper hours; the discrimination that he suffered; and the lack of access to tip sheets.

80. When Plaintiff made his complaints, he was met with a range of responses. In particular, Defendants went to great lengths to dissuade Plaintiff from bringing his complaints to the Department of Labor. After he complained to the General Manager of the Hotel, Barabara Christoph, explicitly told him not to go to the DOL and instead work to "resolve our issues here."

81. However, since none of the meetings Plaintiff participated in actually resolved any of the issues that he faced, he continued to complain. Over time, the responses to his complaints became much more negative. After the meeting with the General Manager, Manager Julian told

Plaintiff to "watch himself" and that "if you [Plaintiff] don't change your attitude, I will have to fire you."

82. When Plaintiff continued making complaints about Defendants' unlawful practices, his managers moved beyond threats into outright retaliation. Plaintiff's managers, Julian and Camille [LNU], started disciplining him for minor or made-up problems such as not smiling at Julian when he arrived. Julian especially, started yelling at Plaintiff about everything he did, calling him names, and making negative comparisons between Plaintiff's mental faculties and Julian's autistic son. He also told Plaintiff that going over his head to HR had been the wrong thing to do, and implied that there might be consequences for such action.

83. On April 15, 2025, Plaintiff arrived for work as usual. When he went to clock in, he was confronted by Manager Julian. Julian said that during Plaintiff's previous shift Plaintiff had improperly given a discount to a customer. When Plaintiff protested that he had not done so and asked to see any documentation or speak with whoever had supposedly witnessed his improper behavior, Julian refused. Julian informed Plaintiff that he was fired, effective immediately, and had Plaintiff escorted from the premises by hotel security.

84. Defendants' termination of Plaintiff over an entirely concocted story is clearly pretext for their desire to dispose of an employee who was drawing attention to Defendants' illegal actions. Defendants had previously attempted to prevent Plaintiff from exercising his rights under the FLSA and the NYLL and suppress his complaints. When that failed they escalated to retaliation, first by degrading his employment conditions in the hope that he would quit and then by firing him when he did not quit.

85. Defendants knowingly and willfully interfered with Plaintiff's attempts to exercise his rights under the FLSA, NYLL, NYSHRL, and NYCHRL.

86. Defendants willfully and intentionally retaliated against Plaintiff for his attempts to exercise his rights under the FLSA, NYLL, NYSHRL, and NYCHRL.

*Plaintiff's Individual Business Expenses Claim*

87. When Plaintiff started working for Defendants, the bar was almost entirely cashless. Defendants did not maintain cash on site, preferring to allow guests to pay by card or charge their drinks to their room. When a new manager, Julian [LNU], was hired, he decided that he wanted to start accepting more cash in order to drive more business. However, because Defendants did no keep cash on hand at the bar, they had nothing to make change with. To solve this problem, Manager Julian required Plaintiff to withdraw three hundred dollars ($300.00) of his own money in different denominations in order to stock the cash register. Although the amount remained roughly the same as people purchased things, with Plaintiff only needing to switch larger bills for smaller ones at the bank, there were a few times he was required to restock the register—again with his own money.

88. Plaintiff knew that this requirement was well outside the bounds of his position, but he feared for his job due to Manager Julian's aforementioned retaliation and discrimination, and his outright threats to fire him. Plaintiff never got any of the money that he used to originally stock the register back.

89. Defendants knowingly and willfully forced Plaintiff to pay for their business expenses in order to keep his job with them and are liable to Plaintiff for all said expenses.

90. Plaintiff has retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs, and the Class.

## STATEMENT OF CLAIM

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

91. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

92. At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

93. At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

94. At all relevant times, each Corporate Defendant had gross annual revenues in excess of $500,000.

95. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their wages, including overtime, due to time-shaving.

96. At all relevant times, Defendants had a policy and practice that illegally retained gratuities from Plaintiff.

97. Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

98. Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs their proper wages, including their proper overtime premium, when Defendants knew or should have known such was due.

99. Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

100. As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

**COUNT II**

**VIOLATION OF THE NEW YORK LABOR LAW**

101. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

102. At all relevant times, Plaintiff was employed by the Defendants within the meaning of the New York Labor Law, §§ 2 and 651.

103. At all relevant times, Defendants engaged in a policy and practice of not compensating Plaintiff and Class Members their proper wages, including overtime, due to time-shaving, in direct violation of the NYLL.

104. At all relevant times, Defendants had a policy of not paying Plaintiff or Class Members at the mandated minimum wage.

105. Defendants failed to properly notify Plaintiff and Class Members of their tips and tip pooling policies, in direct violation of the NYLL.

106. Defendants failed to compensate Plaintiff and Class Members with their spread of hours premiums when working shifts in excess of ten (10) hours per day, in direct violation of the NYLL.

107. Due to Defendants' NYLL violations, Plaintiff and Class Members are entitled to recover from Defendants unpaid minimum wages, unpaid wages due to time-shaving, unpaid spread of hours premium, unpaid wages due to illegally retained tips, reasonable attorneys' fees, liquidated damages, statutory penalties and costs and disbursements of the action, pursuant to the NYLL.

**COUNT III**

**VIOLATION OF APPLICABLE STATE WAGE AND HOUR LAWS**

108. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

109. At all relevant times, Class Members were employed by Defendants within the meaning of the applicable State Wage and Hour Laws.

110. Defendants knowingly and willfully violated Class Members' rights by failing to pay them: (1) minimum wages, as mandated by the relevant state laws and statutes, (2) for every hour worked, including overtime, due to a policy of timeshaving, and (3) all tips and gratuities owed to Class Members, due to an illegal policy of retaining tips.

111. Defendants knowingly and willfully failed to provide proper wage statements and notices to Class Members, as required under the applicable state wage and hour laws.

112. Due to Defendants' state law violations, Class Members are entitled to recover from Defendants their unpaid minimum wages, unpaid regular and overtime compensation, statutory

penalties, liquidated damages, reasonable attorneys' fees and costs and disbursements of this action.

**COUNT IV**

**VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW**

**(Plaintiff's Individual Claim)**

113. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

114. The New York State Human Rights Law ("NYSHRL") prohibits discrimination in the terms, conditions, and privileges of employment, and the retaliation thereof, on the basis of race and national origin.

115. Plaintiff was an employee and qualified person within the meaning of the NYSHRL and Defendants are covered employers under the NYSHRL.

116. Defendants operated a business that discriminated against Plaintiff in violation of Section 296(1)(a) with respect to the terms, conditions, and privileges of his employment because of his race and national origin.

117. Defendants' conduct was intentional, malicious, and in reckless disregard of Plaintiff's protected rights under Section 296 of the NYSHRL.

118. As a result of Defendants' unlawful discriminatory practices, Plaintiff sustained injury, including economic damages and past and future physical and emotional distress.

119. Due to Defendants' violations under the NYSHRL, based on discrimination, Plaintiff is entitled to recover from Defendants: (1) back pay; (2) compensatory damages; (3) punitive damages; and (4) attorney's fees and costs.

120. Additionally, Defendants violated the NYSHRL by creating and maintaining a hostile work environment. This hostile work environment was created and fostered through pervasive and regular harassment in the form of comments and behavior directed towards Plaintiff.

121. The hostile work environment was sufficiently severe and pervasive to unreasonably interfere with Plaintiff's employment and/or create an intimidating, hostile, and offensive work environment for Plaintiff, which led to his constructive termination.

122. As a direct and proximate result of said hostile work environment, Plaintiff suffered and continues to suffer actual damages in various ways, including but without limitation, loss of past earnings, mental anguish, and pain and suffering. Plaintiff seeks judgment in an amount to be determined at trial for these damages as well as an award of punitive damages, interest, attorney's fees, and costs, as provided for under the NYSHRL.

**COUNT V**

**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**

**(Plaintiff's Individual Claim)**

123. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

124. At all relevant times, Plaintiff was an employee within the meaning of the NYCHRL and Defendants are covered employers under the NYCHRL.

125. Defendants operated a business that discriminated against Plaintiff in violation of the NYCHRL by discriminating against Plaintiff with respect to the terms, conditions, and privileges of his employment because of his race and national origin in various ways, including but not limited to creating and fostering a hostile work environment based on Plaintiff's race and national origin.

126. Defendants' conduct was intentional, malicious, and in reckless disregard of Plaintiff's protected rights under the NYCHRL.

127. As a result of Defendants' unlawful discriminatory practices, Plaintiff sustained injury, including economic damages, past wages, physical and emotional distress.

128. Due to Defendants' violations under the NYCHRL, based on discrimination, Plaintiff is entitled to recover from Defendants: (1) back pay; (2) compensatory damages; (3) punitive damages; and (4) attorney's fees and costs.

129. Additionally, Defendants violated the NYCHRL by creating and maintaining a hostile work environment. This hostile work environment was created and fostered through pervasive and regular discrimination in the form of comments and behavior directed towards Plaintiff.

130. The hostile work environment was sufficiently severe and pervasive to unreasonably interfere with Plaintiff's employment and/or create an intimidating, hostile, and offensive work environment for Plaintiff, which led to his constructive termination.

131. As a direct and proximate result of said hostile work environment, Plaintiff suffered and continues to suffer actual damages in various ways, including but without limitation, loss of past and future earnings, mental anguish, and pain and suffering. Plaintiff seeks judgment in an amount to be determined at trial for these damages as well as an award of punitive damages, interest, attorney's fees, and costs, as provided for under the NYCHRL.

## COUNT VI

## INTERFERENCE AND RETALIATION UNDER THE FAIR LABOR STANDARDS ACT

**(Plaintiff's Individual Claim)**

132. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

133. At all relevant times, Defendants were an employer within the meaning of the FLSA.

134. The Fair Labor Standards Act 29 U.S.C. § 215 (a)(3) states that:

> "[I]t shall be unlawful for any person…to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter…"

135. Defendants willfully violated Plaintiff's rights under the FLSA by interfering with his attempt to institute a complaint with the Department of Labor and by retaliating against him by subjecting him to verbal abuse and harassment.

136. As alleged herein, Defendants further violated Plaintiff's rights by terminating him for complaining about Defendants' wage and hour policies and threatening to go to the Department of Labor.

137. This conduct was in willful disregard for the provisions of the FLSA.

138. As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff suffered damages in the form of lost earnings and egregious emotional distress. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, damages for egregious emotional distress, back pay, front pay, and attorneys' fees and costs.

**COUNT VII**

**<u>INTERFERENCE AND RETALIATION UNDER THE NEW YORK LABOR LAW</u>**

**(Plaintiff's Individual Claim)**

139. Plaintiff realleges and incorporates all the foregoing paragraphs of this class and collective action Complaint as if fully set forth herein.

140. At all relevant times, Plaintiff was an employee of Defendants within the meaning of the NYLL, and was a person covered by and intended to benefit from the provisions of the NYLL.

141. Defendants willfully violated Plaintiff's rights under the NYLL by retaliating against Plaintiff by terminating his employment after asserting his rights under the NYLL.

142. Defendants' actions constitute a violation of Section 215 of the NYLL. In relevant part, NYLL § 215(1)(a) states:

> No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, <u>reasonably and in good faith, believes violates any provision of this chapter,</u> or any order issued by the commissioner. . . . (emphasis added).

143. As alleged herein, Plaintiff was terminated by Defendants for complaining to Defendants about their illegal wage and hour policies, in violation of Section 215(a).

144. This retaliatory conduct by Defendants was in willful disregard of the provisions of the NYLL.

145. As a direct and proximate result of Defendants' willful disregard of the NYLL, Plaintiff suffered damages in the form of lost earnings and egregious emotional distress. Plaintiff

seeks all applicable remedies under the law, including compensatory damages, punitive damages, damages for egregious emotional distress, back pay, front pay, and attorneys' fees and costs.

**COUNT VIII**

**RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW**

**(Plaintiff's Individual Claim)**

146. Plaintiff realleges and incorporates all the foregoing paragraphs as if fully set forth herein.

147. The New York State Executive Law § 296(1)(a) provides that:

> "[I]t shall be an unlawful discriminatory practice: For an employer … because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

148. New York State Executive Law § 296(7) provides that:

> "[I]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate. . . against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

149. Defendants violated the New York State Human Rights Law when Defendants retaliated against Plaintiff due to his lawful complaints against Defendants' race discrimination.

150. When Plaintiff complained to Defendants' human resources, Defendants conducted no investigation, claimed that no factual support was found for the complaint, and fired Plaintiff..

151. This retaliatory conduct was in willful disregard of the provisions of the NYSHRL.

152. As a direct and proximate result of Defendants' willful disregard of the NYSHRL, Plaintiff suffered damages in the form of lost earnings. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT IX

## RETALIATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

**(Plaintiff's Individual Claim)**

153. Plaintiff realleges and incorporates all the foregoing paragraphs as if fully set forth herein.

154. The New York City Administrative Code §8-107(1) provides that:

> "[I]t shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

155. The New York City Administrative Code §8-107(1) also provides that:

> "[I]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter,. . . (v) requested a reasonable accommodation under this chapter. . ."

156. Defendants violated the New York State Human Rights Law when Defendants retaliated against Plaintiff due to his lawful complaints against Defendants' race discrimination.

157. When Plaintiff complained to Defendants' human resources, Defendants conducted no investigation, claimed that no factual support was found for the complaint, and fired Plaintiff..

158. This retaliatory conduct was in willful disregard of the provisions of the NYCHRL.

159. As a direct and proximate result of Defendants' willful disregard of the NYCHRL, Plaintiff suffered damages in the form of lost earnings. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs, and Class Members, respectfully requests that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the FLSA, NYLL, NYSHRL, NYCHRL, and applicable State Wage and Hour Laws;

b. An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c. An award of unpaid wages, including minimum wages, due under applicable State Wage and Hour Laws;

d. An award of unpaid wages, including overtime wages due to timeshaving, due under the FLSA and applicable State Wage and Hour Laws;

e. An award of unpaid spread-of-hours premiums due under the NYLL;

f. An award equal to the amount of the improperly retained tips withheld by Defendants;

g. An award of statutory penalties as a result of Defendants' failure to comply with the wage notice and wage statement requirements of applicable State Wage and Hour Laws;

h. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay proper wages pursuant to the FLSA;

i. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay proper wages pursuant to applicable State Wage and Hour Laws;

j. An award of compensatory damages for Plaintiff's injury resulting from Defendants' unlawful discriminatory practices, pursuant to the FLSA, NYLL, NYSHRL and NYCHRL;

k. An award of punitive damages for Plaintiff's injury resulting from Defendants' unlawful discriminatory practices, pursuant to the FLSA, NYLL, NYSHRL and NYCHRL;

l. An award of back pay, compensatory damages, punitive damages, and all other penalties the Court deems appropriate as a result of Defendants' willful retaliatory conduct against Plaintiff, pursuant to the FLSA, NYLL, NYSHRL, and NYCHRL;

m. An award of pre-judgment and post-judgment interests, costs and expenses of this action together with reasonable attorneys' fees, expert fees, and statutory penalties;

n. Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

o. Designation of this action as a class action pursuant to F.R.C.P. 23;

p. Designation of Plaintiff as Representative of the Class; and

q. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Date: January 8, 2026

Respectfully submitted,

By: */s/ C.K. Lee*

C.K. Lee, Esq.
**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, Eighth Floor
New York, New York 10011
Tel.: (212) 465-1188
Fax: (212) 465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*